UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES S. KAPLAN; GERALDINE KAPLAN; and GREENBERG & KAPLAN, LLP;<br><br>*Plaintiffs,*<br><br>-against-<br><br>JPMORGAN CHASE & CO.; and JOHN DOES 1-25,<br><br>*Defendants* | Civil Action No.:<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs, JAMES S. KAPLAN ("James"); GERALDINE KAPLAN ("Geraldine")(collectively, the "KAPLANS") and GREENBERG & KAPLAN, LLP ("G&K") (collectively "Plaintiffs") by their attorneys, allege and complain of Defendants JPMORGAN CHASE & CO. ("JP Morgan") and JOHN DOES 1-25 (collectively "Defendants") as follows:

## PRELIMINARY STATEMENT

1. JAMES, a prominent, New York City attorney, is a victim of identity theft.

2. GERALDINE, JAMES' wife, is also a victim of the same identity theft.

3. JAMES' law firm, G&K, is also a victim of the same identity theft.

4. The perpetrator (or perpetrators), who is unknown to Plaintiffs, unlawfully transferred funds from four (4) different banks accounts: (i) the Kaplans' Joint Chase Premier Checking Account ending 3765(the "Joint Checking Account"); (ii) G&K's Chase Business Complete Checking Accounting ending 1386 (the "Business Account"); (iii) G&K's Chase Business Complete Checking Account ending 6922 (the "Escrow Account"); and (iv) G&K's Chase Business Complete Checking Account ending 6822 (the "Agency Account").

14

5. Plaintiffs promptly and repeatedly disputed the charges with Defendant, JP MORGAN.

6. Despite their obligation under the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq. ("EFTA") to promptly credit the Joint Checking Account in full, JP MORGAN has refused to credit Plaintiffs, JAMES and GERALDINE, for the Joint Checking Account for the stolen funds.

7. Similarly, and despite their obligations under Article 4-A of New York's Uniform Commercial Code ("UCC"), JP MORGAN has refused to credit Plaintiff, G&K's, accounts for the stolen funds.

8. Accordingly, Plaintiffs bring claims against Defendants for violations of EFTA and the UCC.

## JURISDICTION AND VENUE

9. The Court has jurisdiction pursuant to 15 U.S.C. § 1693m and 28 U.S.C. § 1331. Supplemental jurisdiction exists for the New York state law UCC claim pursuant to 28 U.S.C. § 1367.

10. Jurisdiction over Plaintiffs' claim for declaratory relief is conferred by 28 U.S.C. § 2201.

11. Venue is proper in this District because Plaintiffs reside and/or regularly conduct business in this District, a substantial part of the events and occurrences underlying this litigation occurred within this District, and Defendants regularly conduct business here.

14

## PARTIES

12. Plaintiff, JAMES, is a natural person and citizen of New York residing in Westchester County, New York.

13. Plaintiff, GERALDINE, is a natural person and citizen of New York residing in Westchester County, New York.

14. Plaintiff, G&K, is a limited liability partnership law firm with its principal place of business in New York County, New York.

15. Plaintiff, JAMES, is the founding partner of G&K, has been practicing law for over 40 years, and is one of New York City's leading tax, estate, and guardianship attorneys.

16. Plaintiff, JAMES, is a "consumer" as defined by the EFTA, 15 U.S.C. § 1693a(6).

17. Plaintiff, GERALDINE, is a "consumer" as defined by the EFTA, 15 U.S.C. § 1693a(6).

18. At all times relevant, the KAPLANs' checking and savings accounts with JP MORGAN were used for personal, family, or household purposes.

19. Defendant, JP MORGAN, is a foreign corporation with its principal executive office address at 383 Madison Avenue, New York, New York 10179.

20. Defendant, JP MORGAN, is a national banking association formed under the laws of the United States and was, at all times relevant to this Complaint, a financial institution as defined by the EFTA, 15 U.S.C. § 1693a(9).

**FACTS**

21. On August 19, 2024, JAMES was contacted by telephone by an individual impersonating a customer service representative from the "Fraud Department" of JP MORGAN (the "Fraudster").

22. Using subterfuge and deception, the Fraudster was able to ascertain confidential information allowing them to infiltrate the Joint Checking Account, the Agency Account, and the Business Account.

23. Using this information, between August 19-20, 2024, the Fraudster gained unauthorized access to Plaintiffs' accounts with JP MORGAN, and initiated several unauthorized and fraudulent transfers from the Joint Checking Account, the Escrow Account, the Agency Account, and the Business Account.

24. On August 19, the Fraudster initiated a series of unauthorized and fraudulent transactions from Plaintiffs' accounts: (i) an online transfer of $30,000 from the Joint Checking Account to the Business Account ("Transfer A"); (ii) an online transfer of $18,000.00 from the Agency Account to the Business Account ("Transfer B"); and (iii) the following wire transfers totaling $47,999.99 from the Business Account to Unknown Persons:

- August 19, 2024, for $14,000.00 ("Transfer C");
- August 19, 2024, for $17,000.00 ("Transfer D"); and,
- August 19, 2024, for $16,999.99 ("Transfer E")

25. After receiving alerts from JP MORGAN notifying it of the completed (albeit unauthorized) transmission of Transfers C, D, and E, the Fraudster, once again impersonating the "Fraud Department", contacted JAMES, assuring him that the unauthorized transfers would be cancelled and reversed within a day.

14

26. On August 20, the Fraudster called JAMES, maintaining their deception as a member of the "Fraud Department", and confirmed that the reversal of Transfers C, D, and E was imminent, while requesting additional information concerning Plaintiffs' accounts to seemingly expedite the reversal.

27. Soon thereafter, the Fraudster initiated another series of unauthorized and fraudulent transactions from Plaintiffs' accounts: (i) an online transfer of $27,431.42 from the Joint Checking Account to the Business Account ("Transfer F"); (ii) an online transfer of $15,000.00 from the Escrow Account to the Business Account ("Transfer G"); and (iii) the following wire transfers totaling $33,999.99 from the Business Account to Unknown Persons:

- August 20, 2024, for $17,000.00 ("Transfer H"); and,
- August 20, 2024, for $16,999.99 ("Transfer I")

28. At approximately 12:15 p.m. on August 20, 2024, disturbed by the latest notifications of Transfers H and I, Plaintiffs promptly visited the JP MORGAN branch located at 349 5th Ave, New York, New York 10016. Attended to by Branch Manager, Ellis Keller, Plaintiffs expressed their shock and dismay at all of the unauthorized transfers initiated on August 19 and 20, 2024, and immediately instructed Mr. Keller to cancel and reverse all of the unauthorized transfers.

29. At this point, Mr. Keller conveyed to Plaintiffs that a fraud had been perpetrated on them, and took measures to forestall any ongoing attempts by the Fraudster by freezing the compromised Joint Checking Account, Escrow Account, Agency Account, and Business Account, and launching an internal inquiry with JP MORGAN into the unauthorized and fraudulent transfers (the "Inquiry").

30. Concurrently with Plaintiffs visit to the bank branch, the Fraudster attempted to initiate another unauthorized transfer from the Business Account and sent Plaintiffs an e-mail,

14

posing as the "Fraud Department", wherein the Fraudster summarized the day's unauthorized transfers.

31. Plaintiffs' cancellation request was successfully processed with respect to this one unauthorized transfer of $14,000.00.

32. Pursuant to the fraud, the Fraudster initiated unauthorized Transfers A, B, F, and G, and fraudulently transmitted $90,431.42 from the Joint Checking Account, the Agency Account, and the Escrow Account, into the Business Account.

33. As a result, unauthorized Transfers C, D, E, H, and I were successfully made from the Business Account, allowing the Fraudster to fraudulently siphon $81,999.98 from Plaintiffs to these Unknown Persons:[1]

- August 19, 2024, for $14,000.00;
- August 19, 2024, for $17,000.00;
- August 19, 2024, for $16,999.99;
- August 20, 2024, for $17,000.00; and,
- August 20, 2024, for $16,999.99

34. Despite Plaintiffs taking all necessary steps to comprehensively and promptly alert JP MORGAN of the fraudulent conduct, and dispute the unauthorized transfers, JP MORGAN has failed Plaintiffs.

35. On August 30, 2024, Plaintiffs received an update from JP MORGAN concerning the Inquiry.

---

[1] To the Plaintiffs' knowledge, Transfers C, D, and E, on August 19, 2024, totaling $47,999.99, were made to (i) "Khadija Parker" of Fort Lauderdale, FL 33313; (ii) "Kayla Thompson" of North Fort Lauderdale, FL 33068; and (iii) "Courtney Hostzclaw" of North Fort Lauderdale, FL 33068. Transfers H and I, on August 20, 2024, totaling $33,999.99, were made to (iv) "Sharonda Jackson" of Pompano Beach, FL 33060 and (v) "Johnny Thomas" of Lauderhill, FL 33311. Notably, Plaintiffs reimbursed the Escrow Account within approximately an hour of being notified of the unauthorized transfers.

14

36. Therein, JP MORGAN unfairly and unjustly denied Plaintiffs' claims, stating that, "[w]e are denying your claim because we determined that the item(s) being disputed were authorized or you received benefit from the item(s). We will not reimburse your account."

### FIRST CLAIM FOR RELIEF
**(Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et seq.*) (As to Transfers A and F)**

37. Plaintiffs repeat and re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

38. Per the EFTA, Regulation E, and Regulation E's Official Interpretations, JP MORGAN bears the responsibility for unauthorized transfers like the present ones (Transfers A and F).

39. The EFTA caps consumer liability for unauthorized electronic fund transfer at $50 and the transactions at issue exceed that amount. 15 U.S.C. § 1693g(a).

40. Once the KAPLANS notified JP MORGAN of the unauthorized transfers (Transfers A and F), JP MORGAN was required to conduct a bona fide reasonable investigation to determine if fraud occurred as required by the EFTA.

41. However, JP MORGAN failed to conduct a reasonable investigation.

42. A reasonable investigation would have included review of one or more of the following items, which would have led JP MORGAN to conclude that fraud had occurred and would have revealed, *inter alia*, the following:

    a. The KAPLANS did not authorize the disputed transactions (Transfers A and F);

    b. The KAPLANS promptly reported the fraudulent transactions (Transfers A and F);

    c. The KAPLANS have no history of making false or unverifiable

14

    fraud reports;

  d. The KAPLANS have no criminal history;

  e. THE KAPLANS have no history of irresponsible use of their account;

  f. The KAPLANS have no history of frauds with JP MORGAN or any other financial institution; and,

  g. No other proof exists to refute the KAPLANs' claim.

43. Furthermore, the EFTA places the burden of proof on JP MORGAN to demonstrate that challenged transfers were authorized or, if they were unauthorized, that the KAPLANs can be held liable for them. 15 U.S.C. § 1693g(b).

44. This burden of proof cannot be, and was not plausibly, met with regard to the contested transactions (Transfers A and F).

45. JP MORGAN's acts and omissions set forth above constitute violations of the EFTA.

46. As a direct and proximate result of JP MORGAN's violations of the EFTA, KAPLAN is entitled to an award of statutory and actual damages as well as attorney's fees and costs.

47. In light of the foregoing – in addition to all other relief sought herein – the KAPLANS are also entitled to recover treble damages under Section 1693f(e).

**SECOND CLAIM FOR RELIEF**
(New York's UCC §4-A *et seq.*) (As to Transfers B, C, D, E, G, H and I)

48. Plaintiffs repeat and re-allege and incorporates by reference the foregoing paragraphs as if fully set forth herein.

49. The UCC "governs the procedures, rights, and liabilities arising out of

14

commercial electronic funds transfers,' including liability for [] unauthorized transfers," such as Transfers B, C, D, E, G, H, and I. See *Banco Del Austro, S.A. v. Wells Fargo Bank, N.A.*, 215 F. Supp. 3d 302, 303 (S.D.N.Y. 2016) (quoting *Grain Traders, Inc. v. Citibank, N.A.,* 160 F.3d 97, 100 (2d Cir. 1998))

50. Transfer B is a "Funds transfer" pursuant to UCC §4-A 104(1).

51. Transfer C is a "Funds transfer" pursuant to UCC §4-A 104(1).

52. Transfer D is a "Funds transfer" pursuant to UCC §4-A 104(1).

53. Transfer E is a "Funds transfer" pursuant to UCC §4-A 104(1).

54. Transfer G is a "Funds transfer" pursuant to UCC §4-A 104(1).

55. Transfer H is a "Funds transfer" pursuant to UCC §4-A 104(1).

56. Transfer I is a "Funds transfer" pursuant to UCC §4-A 104(1).

57. Transfer B is not a "Payment Order" pursuant to UCC §4-A 103(a).

58. Transfer C is not a "Payment Order" pursuant to UCC §4-A 103(a).

59. Transfer D is not a "Payment Order" pursuant to UCC §4-A 103(a).

60. Transfer E is not a "Payment Order" pursuant to UCC §4-A 103(a).

61. Transfer G is not a "Payment Order" pursuant to UCC §4-A 103(a).

62. Transfer H is not a "Payment Order" pursuant to UCC §4-A 103(a).

63. Transfer I is not a "Payment Order" pursuant to UCC §4-A 103(a).

64. G&K was not the "sender" of Transfer B pursuant to UCC §4-A 103(e).

65. G&K was not the "sender" of Transfer C pursuant to UCC §4-A 103(e).

66. G&K was not the "sender" of Transfer D pursuant to UCC §4-A 103(e).

67. G&K was not the "sender" of Transfer E pursuant to UCC §4-A 103(e).

68. G&K was not the "sender" of Transfer G pursuant to UCC §4-A 103(e).

69. G&K was not the "sender" of Transfer H pursuant to UCC §4-A 103(e).

70. G&K was not the "sender" of Transfer I pursuant to UCC §4-A 103(e).

71. As a general rule, this Section allocates the risk of loss to the receiving bank defined as "the bank to which the sender's instruction is addressed." See UCC § 4-A-103(1)(d).

72. JP MORGAN is a "Bank" pursuant to UCC § 4-A-105(b).

73. JP MORGAN was the "Receiving bank" of Transfer B pursuant to UCC §4-A 103(d).

74. JP MORGAN was the "Receiving bank" of Transfer C pursuant to UCC §4-A 103(d).

75. JP MORGAN was the "Receiving bank" of Transfer D pursuant to UCC §4-A 103(d).

76. JP MORGAN was the "Receiving bank" of Transfer E pursuant to UCC §4-A 103(d).

77. JP MORGAN was the "Receiving bank" of Transfer G pursuant to UCC §4-A 103(d).

78. JP MORGAN was the "Receiving bank" of Transfer H pursuant to UCC §4-A 103(d).

79. JP MORGAN was the "Receiving bank" of Transfer I pursuant to UCC §4-A 103(d).

80. In accordance with UCC, §4-A-202(1) "[a] payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency."

81. Consequently, as the receiving bank that received and honored the Fraudster's

14

"unauthorized" orders, JP MORGAN is liable for the damages to G&K resulting from Transfers B, C, D, E, G, H, and I.

82. Although, UCC §4-A-202(2) provides for an exception to the rule set forth in this subsection, this exception in inapplicable.[2]

83. G&K did not, under any circumstances or in any manner, verify Transfers B, C, D, E, G, H, or I.

84. On the contrary, JAMES promptly appeared in person, on behalf of G&K, at the nearest JP MORGAN branch (along with GERALDINE), within 24 hours, to notify JP MORGAN, and protest the unauthorized transfers from all four accounts, and demand their immediate and irrevocable cancellation and reversal.

85. With the exception of the attempted wire transfer of $14,000.00 from the Business Account, JP MORGAN failed to act.

86. Moreover, JP MORGAN did not afford G&K the opportunity to verify any of the nine unauthorized transactions or the "activation" of new "wire templates" or recipients, prior to the transmission of funds.

87. Had JP MORGAN consulted G&K beforehand, G&K would have demanded that JP MORGAN invalidate all of the relevant transactions.

88. Furthermore, given G&K's extensive history with JP MORGAN, JP MORGAN would have been reasonably expected to notice that Transfers B, C, D, E, G, H, and I were all

---

[2] If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (a) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (b) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer. See UCC § 4-A-202(2)

14

irregular and bizarre, varying markedly from the size, type, and frequency of payment orders normally issued by G&K.

89. JP MORGAN's failure to establish and implement commercially reasonable security procedures facilitated the Fraudster's unauthorized transactions between the Agency Account and Escrow Account, on the one hand, and the two Business Accounts, on the other hand (Transfers B and F), and the Fraudster's unauthorized wire transfers from the Business Account to the Unknown Persons, that saw them steal $81,999.98 from G&K, and incur several bank fees.

90. UCC § 4-A-204(1) further provides that Chase Bank is liable to refund its customers under such circumstances:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is (a) not authorized and not effective as the order of the customer under Section 4-A-202, or (b) not enforceable, in whole or in part, against the customer under Section 4-A-203, the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund.

91. JP MORGAN is required to issue G&K a refund of all stolen amounts fraudulently siphoned from the Agency Account, the Escrow Account, and the Clients' Business Accounts, and all fees charged thereon.

**WHEREFORE,** Plaintiffs seek judgment in his favor and damages against Defendants:

A. Awarding Plaintiffs against Defendants actual damages, treble damages, statutory damages, punitive damages, declaratory relief, injunctive relief, costs, and reasonable attorneys' fees; and

B. such other and further relief as may be necessary, just, and proper.

14

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury as to all issues so triable.

Dated: March 7, 2025

/s/ Benjamin J. Wolf
Benjamin J. Wolf, Esq.
bwolf@legaljones.com
Joseph K. Jones, Esq.
jkj@legaljones.com
Jones, Wolf & Kapasi, LLC
630 Third Avenue, 18th Floor
New York, New York 10017
(646) 459 7971
*Attorneys for Plaintiffs.*